Thank you, John Lambros on behalf of Mr. Jennings. Do I have 15 minutes or 10 minutes? The docket indicates 15. OK, the clock says 10. So I'd like to reserve two minutes at the end for my rebuttal. As the court knows, I'm here in order to address this court's certified claim, which essentially, I think, gets to the essence of the question presented that was brought to the Nevada Supreme Court many years ago in Mr. Jennings' second appeal after his retrial, and which was litigated in the district court below. And that is, essentially, whether or not under these circumstances, under Nevada law, and given the way that the jury was both instructed and the way that the case was argued on retrial, the felony murder theory for second degree kidnapping did indeed constitute a separate element of the offense of first degree murder, as opposed to a separate theory. If it's a separate theory, admittedly, Shadd controls. If it's a separate element, by Shadd's own language, Winship, Sandstrom, and Apprendi control. And that's what I argued in my opening brief. And that's essentially what Shadd says anyway. And if you look at the citation that Shadd that I'm talking about is the citation that talks about when the- I want to make sure I understand this. How does Shadd not control? I'm saying, with regard to whether or not you need a general verdict will satisfy the constitutional due process requirement that alternate theories need not be unanimous, Shadd controls. But, and this court framed the question, if you look at the question presented by the court, where the alternate theories require different or constitute different elements, then a general verdict will not survive a due process test. And that's my argument. In this case, second degree kidnapping, which is exactly what the state went to the jury on, and frankly, Mr. Jennings' prior testimony is inextricably linked to the state's theory, because throughout the pretrial proceedings on the retrial, the state kept emphasizing, both in their pretrial motion practice, in their opening statement, and I think particularly in their opening statement, where the district attorney said, without really legally having a permission to do that, and acknowledging that it was against the Nevada law for him to argue the law, the district attorney planted the felony murder second degree kidnapping seed. And I just cite the case, the court to the amended petition, exhibit 47, at pages 189 and 190, where Mr. Coote, on behalf of the state, said that in our state, in the state of Nevada, it doesn't take much to, I might use my own words, jackpot Mr. Jennings for first degree murder. All we need to show in Nevada is that he detained the victim. And that's it. Not that he had to have the intent to commit substantial bodily harm or injure the victim, just detain him. So if you look at Shett, I'm sorry. Well, I'm just trying to understand your argument. That's not good. But it looks like the Arizona statute in Shadd is virtually identical to the one here, and the Supreme Court did not require juror unanimity. As to the alternate theories by which the first degree murder could be committed, I mean, there, in that case, the prosecution presented the jury with both felony murder and premeditated murder theories to support the same count of first degree murder. I guess here, the prosecution presented those theories plus an additional one of lying in wait. How is this that different that would require a different outcome in light of how similar this was? Let me see if I can take the answer one step at a time. And I think the most important response I have to make is that I have to, in these very precious few minutes I have, get you to understand my theory. What I'm saying here is I'm answering the question presented by telling the court that under the way the jury was charged in this case, the way that Mr. Jennings was charged, the way the jury was instructed, and the way the state went to the jury. Which was the same way as in Shadd. No, it was not. In Shadd. Tell me the difference. Shadd was a robbery felony murder. It wasn't a second degree kidnapping felony murder. And I think, if you look at Shadd's moral equivalency test, and I'll just read from Shadd itself, the Shadd opinion states that if then two mental states are supposed to be murdered. Can you speak into the microphone? Into the mic. If then two mental states are supposed to be equivalent means to satisfy the mens rea element of an offense, they must reasonably reflect notions of equivalent blameworthiness or culpability, whereas a difference in their perceived degrees of culpability, and I emphasize this, would be reason to conclude that they identified different offenses altogether. But, excuse me, counsel, in the Evans case, Nevada case, it said because actual intent to kill during the commission of a kidnapping can reasonably be considered the moral equivalent of premeditation, unanimity would not be required. But that's not the theory that the state went to in this, went to the jury in this case. The state went to the jury on the theory that what you just quoted, Judge Nelson, was first degree kidnapping. The state went to the jury on, and this, I think, is important, I'm not splitting hairs here, I really am not. The state went to the jury on second degree kidnapping, and the intent is negligible, it's detained. And really, the facts to support that theory are very, very razor thin. And that's why the prior testimony issue is so inextricably linked to this certified claim, because by the state's own admission, that's all they had was Mr. Jennings' tainted prior testimony to hook him up for second degree felony kidnapping. And I'll tell you, I think the best answer to the question comes from the state itself in their rebuttal closing argument. And I will quote, because I think that this is compelling. This is the last thing the jury heard before they deliberated. Because it doesn't, this is the state. Because it doesn't matter whether the gun goes off accidentally, intentionally, or unintentionally, and that's the reason for it. And this is what I think is important. This is what separates Nevada from Arizona. It is not just kidnapping. And you're in the state of Nevada now. If you come up from some other state, maybe the laws are different there. But kidnapping in this state, particularly second degree kidnapping, is a very broad definition. All it means is that you have to willfully detain somebody. Whatever happens after that, Mr. Jennings is guilty of first degree murder. Now, at the other end of the spectrum, they had to prove premeditation, deliberation, and willfulness. And at this time in Nevada, and I've argued this before, unrelated cases to this court. And this time in Nevada, all three of those were separate elements of the offense. And this court's cases out of Nevada, Polk and Chambers talk about that. So that was what the state, that was what the state had to choose on aisle number one. They couldn't prove that. They could not even by the defendant's own testimony. Getting to what Judge Murguia pointed out with regard to the third theory, the lying in wait. As I say in my briefing, and the state did not even discuss this in their answering brief, that was, in my opinion, an illegal theory. Because all of the evidence that was presented at trial by the state and through Mr. Jennings' prior tainted testimony, indicated that Mr. Brown, the victim in this case, was not the intended victim. Was not the person that Mr. Jennings, according to the state's own theory, went to the post office in order to kill that morning. So the lying in wait was an illegal theory. And I think, and I point this out in my opening brief, under Stromberg and Yates and Griffin, that's a theory that taints the rest of the case. But he forced Mr. Brown into the car at the point of a gun. Well, you know, there's, first of all, the state never argued that. And for good reason. The facts did not show that. What the state argued, Judge Nelson, was that he detained him. He detained him with the gun. And by detaining him with the gun, that is not the same thing as forcing him with the intent to commit bodily harm. Again, a subtle, but very important. Are we splitting hairs here? I don't think so. I really don't think so. And I don't think. He puts a gun and says, get into the car. And you're saying, now the state didn't prove that he had the intent to kill me. Again, the best evidence of that fact came from the defendant's own mouth in the first trial, when he was defending himself, not for felony murder, but for first degree deliberate murder. A question that I hope the court will certify. What the defendant said, and I urge the court to look at his testimony. What the defendant said is that he waved the gun, and Jim, the victim, who he knew, Mr. Brown, walked over because, and it was the defense's theory, and quite frankly, a very plausible one, Mr. Brown thought that Mr. Jennings, who had been on a 48-hour Coke binge, had been drinking very heavily and was mentally in complete shambles. Mr. Brown was not coming over there because of any type of intimidation, but to try to stop Mr. Jennings from doing something crazy like killing himself, which was what Mr. Jennings' intent was that morning, was to kill himself. And that's why I really think that when you look at this, by the state's own mouth, how often can I get up here and say that? The last thing that the prosecutor said to the jury was, it doesn't matter in Nevada. It may in some other state, i.e. Arizona, Judge Merguia. That's what separates this case from Schad. I'm not saying that Schad does not apply. That would be crazy for me to say that. Of course not. And I think that the attorney general misunderstood my briefing, and I tried to clarify that in the reply brief. I don't think I needed to. But this is a Winship case. This is a Sandstrom-Winship-Apprendi case. Why did Mr. Brown get in the car? He didn't get in the car. He leaned through the window to try to grab the gun. That was the best evidence. Because remember, from the testimony, what happened was after the gun went off, Mr. Brown fell almost on Mr. Jennings' lap and then fell to the ground, and Mr. Jennings pulled out of there and turned himself into the first police officer he could find. Your theory is that Mr. Brown was reaching in the window to grab the gun. Yes. And that was the defense's theory, both in the first trial and in the second trial. In the second trial, we were at complete odds because the prior testimony was allowed to be presented to the jury after the state. And I think the state was being too cute by half. And the Nevada Supreme Court busted them for that on the first go-around. But by allowing that prior testimony to come in in the second go-around, as I said in my briefing, it was pretty much preordained because there was no way that Mr. Jennings was gonna be able to survive a felony murder conviction. The way the jury was charged, instructed, which was, I'm saying, in violation of the Shad-Winship line of cases. And Shad acknowledges Winship. In fact, the dissent in Shad dissented on Winship grounds. The case came to the court and the court looked at it as a Winship case. And that's evident in the way that this court certified the question. Are these alternate theories, which are perfectly legal under Shad, or are they different elements? Which, if they are under Winship, you need proof beyond a reasonable doubt in Nevada by a unanimous jury. And the thing that I think is the icing on the cake we haven't talked about is that special verdict. Not one theory got 12 votes. 10 for felony murder, and 11 for both lying in wait and deliberate murder. So not one theory got 12 votes. I think that speaks to brecht harmless error. I think, by definition, that shows that not any one of those other theories would have carried the day. The illegal lying in wait theory or the premeditation and deliberation theory. And I see I've just about used my rebuttal time. Does the court have any other questions? Not right now. We'll have a minute later. Thank you. Thank you. May it please the court. Michael Bongard for Respondent Renee Baker in this matter. Your Honor, the court's question in this case is whether there was an unreasonable or objectively unreasonable application of shad to the facts in this case. And I would argue to you, first of all, that beyond the objectively unreasonable prong, I think this is a contrary to case. You have a materially indistinguishable set of facts. The district court said so when it wrote its order denying habeas relief in this case. So the only material different fact in this case was that the state proceeded on a theory of kidnapping rather than robbery. He had a statute that was materially, in the words of the district court, materially indistinguishable from the statute in Nevada, referring to the Arizona statute in shad and the statute that was used in the Nevada case. So, Your Honor, if there was ever a case where there would be a contrary to analysis, this would be the case. We have materially indistinguishable facts. With regards to- But respond to your opposing counsel's explanation for why the fact that this is that similar to shad does no longer, or shouldn't be taken into account in light of the arguments that he presented. Your Honor, the arguments he cited to the court, Sandstrom, Winship, and Apprendi, citations to those cases never appeared in the appellate brief submitted to the Nevada Supreme Court or in the amended habeas petition submitted to the district court.  Aside from shad, there's another way of relief. To the extent that he's presenting that argument, that was an argument that was never presented to the federal district court, nor was it an argument that was submitted to the Nevada Supreme Court. Why was the jury asked to return a special verdict on the theories underlying the conviction? If it didn't matter, why did you do it? Your Honor, I believe it was requested in this case, and again, I'm not familiar with the exact reason in the record, but there was a special verdict given. It wasn't required, and certainly, that was part of the argument in shad. The argument in shad was, especially by the dissent, well, how do we know this wasn't a 6-6 case as far as jury verdict? And I think whether or not there was a special verdict is immaterial to the analysis because there's no component that requires that. Because it doesn't matter that there weren't, there wasn't unanimity on any of the theories. Well, and that's the holding in shad. You don't need unanimity with regards to the theories where the theories are components of the mens rea element of the murder, the first degree murder. Let me tell you what bothers me about this case is whether the mens rea for felony murder kidnapping is similar enough to substitute for the mens rea for premeditated murder. The mens rea for premeditated murder is arguably different from the mens rea for kidnapping, though both require use of force to harm someone. Now, to me, this is the closest question in this case, and opposing counsel said there was not use of force in this case, that Mr. Brown reached through the window and was trying to grab the gun to keep your client, I mean, his client from shooting himself. What is your response to this? Well, Your Honor, I would look to, first of all, the holding of the Nevada Supreme Court and the district court recognized this with respect to another ground that was raised. They concluded that the killing of the victim occurred within the rea gestae of kidnapping, and they concluded that there was also sufficient evidence to establish the corpus delecti. So in the mind of the Nevada Supreme Court, and again, those factual findings are entitled to deference, they found enough there to satisfy the kidnapping. So getting back to Shad, again, if we have enough to satisfy the kidnapping, you have enough to satisfy that theory, that mens rea, that is, and again, Shad recognized the fact that the mens rea for a felony murder, there was a difference there. But what's the difference between first degree kidnapping and second degree kidnapping? Well, that was a question, Your Honor, that question was never addressed in Shad. Again, unless you go back to Justice Scalia's analysis in the concurring opinion, where he said, back in the common law, that all murder was considered first degree murder, and murder included kidnapping. And again, back then, there also were not the degrees of kidnapping. And that's what distinguishes this case from Shad, is it not? It depends, well, Your Honor, I don't believe so, because of the fact that if you look at, and I believe it's, the holding in Shad talks about the fact that, and it was discussed within, um, within the Richardson case, was that, um, they both, and I believe it was the dissenting opinion that said that they both started from a common ground. And that was the fact that, um, if dealing with different theories that substituted the same mens rea, or theories that could be replaceable for the same mens rea, also, whether they were, there was a historical grounding for those offenses. And I think in this case, there is that historical grounding based upon the fact that we're dealing, kidnapping, um, at the time of the common law was the same as the murder. There weren't the separate degrees, so you have that historical underpinning that I believe both courts, Shad and Richardson, Richardson discussed as sufficient to consider the theories, um, to satisfy that analysis that was put forth. Okay, but in Shad, we were concerned with first degree versus second degree, as we were not concerned with that at the common law. But nonetheless, in Nevada, we are concerned with the difference between first degree and second degree, aren't we? We are, Your Honor, but again, without any clear guidance from the United States Supreme Court in this case, we're dealing with ADPA analysis, and there, if you don't feel it's exactly the same, that it doesn't satisfy that contrary to prong, then we have to go back and look at the objectively unreasonable application. And without any further guidance from the United States Supreme Court, I think, Your Honor, we have to say that in this case, there wasn't an objectively unreasonable application. And again, um, and I would analogize this to Sessoms versus Reynolds, where you wrote the dissent, Your Honor, that, um, in analyzing the Davis case, you said that there was no objectively unreasonable application. But, Your Honor, going beyond that, again, we haven't had any guidance, just as in Sessoms, there was no guidance from the Supreme Court with regards to pre-Miranda notification of rights, there's no guidance from the United States Supreme Court here with regards to the different degrees of kidnapping. So again, I would say, Your Honor, that even if the court has a concern with regards to the first and second degree, you still have to fall back that this isn't supervisory review, this is review under ADPA. And that the application in this case isn't objectively unreasonable. Thank you. So. It seems unsettling to get a juror verdict back with no unanimity on any of the theories. But I'm assuming the jury verdict said guilty of murder? What happened, Your Honor, and I think the, at excerpts of record 1095, there were the jury instructions. There were instructions on first degree murder, presentation of the three separate theories, felony murder, lying in wait, and premeditation and deliberation. 1103 gave the premeditated murder instruction. 1104 gave the lying in wait, and 1105 gave the felony murder. There was an instruction at 1110 that said jury unanimity as to first degree murder, not the theory of guilt, is required. Going on to the transcripts when the jury came back, it was at excerpts of record 1136. The jury was polled, and each juror was asked if first degree murder was your verdict, and they all said yes. Was it written down, too, that first degree murder was their verdict unanimously? Yes, it was. And I believe that was, I believe it was at 1208. And then the special verdict form was at 1211. But remember, Shadd also said that there's no due process component that you need a unanimous verdict. On the theory. Well, due process is such. You need a unanimous verdict on murder. What due process also was, they said that there was no due process element with regards to jury unanimity, and I believe that there wasn't a 12, that you didn't need a 12-0 vote. Shadd says that, and I believe later cases discuss whether 11-1 is due process, whether 10-2 is due process. But Shadd itself said that there was no constitutional requirement with regards to jury unanimity on a guilty verdict period. But obviously the holding that we're here on today is the fact that there's no, that the theory of first degree murder, whether it be a felony murder, whether it be premeditated murder, those are substitutable for that mens rea element. Your Honor, the court in Shadd again extensively went through the arguments that were presented in the brief, or in the petition. The court stated, first of all,   The jury had no right to decide as to whether these are elements or theories that we're dealing with. That was already discussed in Shadd, and the district court clearly stated that Shadd had answered that question. With regards to the fact that this case carved out, or was one of the exceptions that was discussed in Shadd, the district court stated that because of the similarities in this case, that this wasn't a case where that was appropriate for one of the exceptions. That because of the similarity of the statutes, because of the similarity of the facts of the case, with the only difference being the enumerated felony that was submitted to the jury, that that wasn't appropriate in this case either. Your Honor, I'm nearing the end of my time. Again, with regards to granting relief in this case, the standard in Harrington versus Richter is a habeas court must determine what arguments or theories supported the state's court's decision, and then it must ask whether it is possible whether fair-minded jurists could disagree that those arguments or theories are inconsistent with the polling in a prior decision of this court. Your Honor, looking at that through that broad scope that was set forth in Harrington, that this isn't a case, Your Honor, where there is that question. That based upon the facts of this case, under that deferential review, the correct answer in this case is that there was no objectively unreasonable application of Shadd to the facts in this case. If there are no more questions, I'll submit. No, thank you. Thank you. Thank you. Briefly respond to a couple of points that opposing counsel made with regard, some technical points with regard to whether or not this claim was ever presented to the Nevada Supreme Court. It was. I just advise this. I draw this court's attention to excerpts of record, page 1225, the opening brief, and also excerpts of record, page 1255, the answering brief filed by cites to the United States Supreme Court case, United States versus Richardson, which as is a follow Shadd, and as Shadd is also a legal elements case, a Winship case, so was Richardson. So it was presented to the Nevada Supreme Court. It was presented to the district court below. The district court below at pages eight and nine of the excerpts of record even point out the fact that we had a very losing argument because these were not elements. They were theories. So any effort at this point, at oral argument before this court to talk about how this question was not preserved, I think is a little bit untimely and desperate. Judge Nelson asked, what's the difference between first and second degree kidnapping? If you look at jury instruction number 12, and if you look at the way that the state presented that to the jury, you'll see that the difference is compelling. First degree kidnapping requires the intent to commit substantial bodily harm, sexual assault, extortion, robbery, murder. Second degree kidnapping, which comes in paragraph two of that instruction, requires the element to simply detain the victim against his or her will. Those are the two differences between the intent elements, which I think are profound, particularly the way it was argued, reminding once again, at the risk of sounding redundant, that the state specifically separated themselves from any other state in this case. In Nevada, it's different. That's what they told the jury. This isn't Arizona. You're out of time, but I wanna ask you about the AEDPA review and deference. Right. To me, this is a contrary to case. Contrary to Winship, Sandstrom, Apprendi. You didn't, and to Shadd. You didn't, this is not a theory. It's an element you do not have. A general verdict does not save the day. Because when there are different elements, there needs to be proof beyond a reasonable doubt. So it's objectively unreasonable. It's contrary to, you have to go to Brecht. It's no different than the line of Nevada cases that this court's familiar with when the first degree murder instruction was challenged, the Polk and Chambers cases. This court found that the Nevada instruction was contrary to Winship, and then went to a harmless error analysis under Brecht. And as I said in my beginning remarks, I think what carries the day for Mr. Jennings with regard to harmless error is the special verdict. Because we have it. It's a matter of record. That you cannot say, conducting a Kodiakus review, you cannot say as the appellate court that they might have convicted under some other theory because of the evidence. They didn't. They told us they didn't. And in Nevada, just not to obscure things, in Nevada, you have to have unanimous verdicts. I agree that there's no constitutional right to a unanimous verdict, but under Nevada law, it is required. So once there's a statutory requirement, minimum due process guarantees that the Nevada courts and prosecutors must follow Nevada law. Thank you. Thank you. The case is submitted. Thank you both for your presentations here today.
judges: Fletcher, Nelson, Murguia